**In re John W. BYRD, Jr.**

No. 01–3927.

United States Court of Appeals, Sixth Circuit.

Filed March 29, 2002.

NATHANIEL R. JONES, Circuit Judge, dissenting.

I herewith revise my previous entered dissent to the court's order lifting the stay of execution of John William Byrd, Jr. This case has become, if nothing else, Exhibit A in the already painfully obvious case that demonstrates our system of capital punishment is not working. The court today refuses the request of Petitioner Byrd to file an action for habeas relief under 28 U.S.C. § 2241. It reasons that the instant request is an impermissible attempt to side step the most recent ruling of the court dismissing Byrd's claim of actual innocence and denying him authorization to file his habeas petition under 28 U.S.C. § 2254. I again, am compelled to dissent, once again, in light of the court's failure to fully perform its constitutional duty as a reviewing court in a capital habeas proceeding.

I.

The court's order lifting the stay of execution was more a result of judicial fatigue than a thorough weighing of Byrd's objections to the Magistrate Judge's application of due process rights at stake in this matter. The heavy death penalty docket weighing down this court takes a grievous toll, and this case is a sad example of it. In my previous dissent to the order vacating the stay of execution, I urged my

colleagues that "[s]eeing as both parties have had an opportunity to respond to the magistrate's proposed findings of fact and recommendation, it is incumbent upon this court—having set this process in motion—to decide for itself whether those findings are acceptable and whether a second habeas petition is warranted. The Order of Remand was not a final delegation of authority to the magistrate to decide the question at issue." *In re Johnny W. Byrd, Jr.*, 277 F.3d 804, 805 (6th Cir.2002) (Jones, J. dissenting).

As is obvious from the current posture of these proceedings, a judicial fatigue operated against the majority which was a factor in the decision to lift the stay of execution then in place. I say this not in condemnation of those of my colleagues, who, with courage, went an extra mile in ordering a remand of this case to the district court and the magistrate judge. I base my comment on the simple fact that when a party objects to a magistrate's factual findings and conclusions of law, the remanding court has an obligation to conduct a de novo review of those findings. *LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir.1988). The failure of this court to conduct such a de novo review of the timely and specific objections to the Magistrate Judge's report precluded a full and fair review of Byrd's claim of actual innocence and thereby rendered his previous filing under § 2254 an inadequate remedy. On this basis alone, it is appropriate to allow Byrd to proceed under § 2241. One of the tragic consequences of the pressure from the State to execute defendants, is the subordinating of constitutional rights of defendants to a mythical search for closure.

## II.

Putting to one side, however, this court's regrettable action, the request for authorization pursuant to § 2241 is especially appropriate as Byrd's objections to the Magistrate Judge's report are substantially meritorious. In many respects, the Magistrate Judge's handling of the fact-finding hearing was sorely disappointing.

## A. THE MAGISTRATE UNDULY RESTRICTED THE SCOPE OF EVIDENCE PRODUCED AT THE HEARING.

At the outset, the Magistrate Judge placed Byrd at a severe disadvantage with several rulings concerning documents to be subpoenaed for the evidentiary hearing. In fairness, reasonable limits on the scope of the factual inquiry were necessary to accommodate the limited time period this court allowed for the evidentiary hearing to take place. Nevertheless, several of the Magistrate Judge's adverse rulings concerning Byrd's request to subpoena relevant evidence cannot be justified. In particular, the Magistrate Judge refused to issue subpoenas for jailhouse informant Virgil Jordan's parole records and all records concerning the testing of blood found in the van at the time of the defendants' arrest.

### (1) Virgil Jordan's Parole Records

The denial of access to Jordan's parole records is simply inexplicable as Jordan was the central figure in the underhanded scheme to fabricate testimony against Byrd. It was Jordan who recruited Ronald Armstead and Marvin Randolph to join the effort to concoct the dubious jailhouse confession that put Byrd on death row. It was Jordan whose grand jury testimony resulted in capital charges being brought against Byrd in the first instance. Thus, it was only reasonable for the Magistrate Judge to require the production of Jordan's parole records since this information was critical to Byrd's efforts to prove that

Jordan conspired with other inmates in the Cincinnati Workhouse to fabricate testimony against him.

By comparison, Byrd's use of Armstead's parole records in these proceedings demonstrates the manner in which Byrd should have been able to use Jordan's records to make his case at the evidentiary hearing. Armstead's records provided critical information as to his parole status and the details of his extensive criminal history. Indeed, from Armstead's parole records, Byrd has irrefutably established that Armstead brazenly lied about his legal status at the time of Byrd's trial. Armstead testified that he had no charges pending, giving the impression that his motivations for testifying against Byrd were eminently pure. His parole records revealed, however, that Armstead was facing up to 15 years in prison as a consequence of violating parole. There is no reason to believe that Jordan's parole records would have been any less valuable to Byrd and to this court in its review of Byrd's claim of actual innocence.

### (2) Blood Evidence Records

The Magistrate Judge's refusal to subpoena records of the Hamilton County Coroner and the Miami Valley Crime Lab with regard to the testing of the blood evidence in this case is similarly indefensible. This is especially so in light of the absence of any eyewitness evidence or physical evidence establishing Byrd's culpability in the murder of Monte Tewksbury. The Magistrate Judge denied Byrd's request on the grounds that "The presence of Tewksbury's blood in the van, in which Messrs. Brewer, Byrd, Woodall and perhaps Pottinger were riding after the murder, does not go to the question of who stabbed Mr. Tewksbury." While this reasoning is consistent with earlier state court findings that the blood evidence did

not incriminate Byrd, the Magistrate Judge's reasoning still misses the point. Byrd obviously agrees that the blood evidence does not show who stabbed Monte Tewksbury. But it is likely to have affirmatively showed that Byrd did *not* do the stabbing, particularly in light of the undisputed fact that Tewksbury's blood did not contain the H-antigen found in the blood on Byrd's pants and in the van. Byrd reasonably sought the crime lab records in this case because the blood analysis should have been more than merely inconclusive; they were likely to have been exculpatory. As a result, the Magistrate Judge's refusal to issue a subpoena for the documents associated with the blood testing impaired Byrd's efforts to make his case and deprived this court of critical evidence to assess Byrd's claim of actual innocence.

### (3) 1982–1983 Cincinnati Workhouse Records

The Magistrate Judge made a further unnecessarily restrictive ruling affecting the scope of evidence produced at the hearing which requires comment. Although the Magistrate Judge agreed to issue a subpoena for certain records in the possession of the Hamilton County Sheriff's Department, the Magistrate Judge so severely limited the subpoena as to preclude important evidence regarding Byrd's claim of actual innocence. At the time of Byrd's trial, the Hamilton County Sheriff was responsible for maintaining the facilities where prisoners are housed while awaiting felony trials in the Hamilton County Court of Common Pleas. In 1983, the Hamilton County Sheriff maintained two facilities, the Hamilton County Jail and the Cincinnati Workhouse. For both institutions, the Sheriff kept records of where inmates were moved, who saw the inmates, and most, if not all, communication with inmates.

Byrd proffered a subpoena to the Magistrate Judge for issuance to the Sheriff's Department requesting all 1982–1983 records concerning John Byrd, Armstead, and Jordan. The Magistrate Judge, however, issued a subpoena of much narrower scope on the erroneous argument that the breadth of Byrd's proffered subpoena exceeded the scope of this court's October 9, 2001 order. Needless to say, to evaluate the truthfulness of the informants' testimony, it was vitally important to know when Armstead and Jordan were transferred to the Workhouse, when they left the Workhouse, and in what area of the Workhouse they were confined. Likewise, such information was obviously necessary to scrutinize the contacts Armstead and Jordan had with law enforcement personnel.

## B. THE MAGISTRATE JUDGE DID NOT FAIRLY ENFORCE BYRD'S REQUESTS FOR RECORDS IN THE POSSESSION OF THE STATE PROSECUTOR OR OHIO ATTORNEY GENERAL.

The Magistrate Judge did not demonstrate an attitude of fairness with regard to Byrd's reasonable attempts to gain evidence in the possession of the Hamilton County Prosecutor or the Ohio Attorney General. Byrd has consistently maintained in these proceedings that the capital indictment returned against him was based, in substantial part, on the perjured testimony of Ronald Armstead and Virgil Jordan. It is undisputed that Jordan did in fact testify before the grand jury. However, counsel for John Byrd did not learn that Armstead also testified at the grand jury proceedings until Prosecuting Attorney William Breyer revealed this fact at Byrd's August 2001 clemency hearing.

When Byrd requested that the state produce the transcript of Armstead's grand jury testimony, Prosecutor William Breyer filed with the Magistrate Judge the grand jury testimony absent the testimony of informant Ronald Armstead. The omission of Armstead's grand jury testimony directly contradicted what Breyer had earlier stated to the Ohio Parole Board at Byrd's clemency hearing that Armstead had indeed testified at the grand jury proceedings. Byrd filed a motion to compel disclosure of Armstead's grand jury testimony. The Magistrate Judge, however, denied the motion and merely asked the state to "look harder" for the transcript. No transcript of Armstead's grand jury testimony was ever produced. The Magistrate Judge's flip admonition to the state prosecutor is puzzling in the context of these proceedings in which the parties have contested every inch of procedural ground. Moreover, I am simply unable to reconcile the Magistrate Judge's tolerance of such flagrant noncompliance with a reasonable discovery request in light of his rather heavy-handed treatment of the Ohio Public Defender regarding the various John Brewer affidavits. Most troubling, however, is the fact that Byrd was again unable to gain access to important evidence to further substantiate his claim that he did not kill Monte Tewksbury.

The importance of a thorough development of the evidentiary record is important in every case, but in the context of a criminal proceeding, a careful treatment of the facts is truly a matter of life and death. When an inmate faces the death penalty, the determination of the facts assumes "an importance fully as great as the validity of the substantive law to be applied." *Wingo v. Wedding*, 418 U.S. 461, 474, 94 S.Ct. 2842, 41 L.Ed.2d 879 (1974) (citation omitted). How disappointing it is then that the Magistrate Judge was rather ineffective in handling the factual inquiry in a manner that would afford Byrd a fair opportunity to develop the facts in support of his actual innocence claim. Again, I submit that in

light of the unduly restrictive scope of the factual inquiry, the appropriate remedy is to permit the filing of Byrd's habeas petition under § 2241.

On the basis of the facts developed at the evidentiary hearing, the Magistrate Judge concluded that Byrd failed to "prove[ ] to the level of clear and convincing evidence that he is actually innocent of the principal offender death specification of which he was convicted." Accordingly, he recommended that this court deny Byrd's request for leave to file a second habeas action. In Byrd's objections to the report of the Magistrate Judge, however, he demonstrates that this recommendation is undermined not only by the limited scope of the factual record, but also by the Magistrate Judge's errors on several critical points of law.

## C. THE CONCLUSION THAT THERE WAS NO "DIRECT EVIDENCE" OF PERJURED TESTIMONY WAS LEGALLY ERRONEOUS.

At the center of Byrd's claim that he is entitled to habeas relief is his assertion that the only evidence supporting his capital conviction is the perjured testimony of Ronald Armstead. The Magistrate Judge identified this claim as Byrd's "strongest claim for collateral attack." Four witnesses (Abdul Mughni, Elwood Jones, Oliver Duff, and Henry O'Hara) testified at the evidentiary hearing that Armstead and Jordan told them their testimony incriminating Byrd was a lie. The Magistrate Judge found that each of the witnesses who testified on behalf of Byrd was credible: "Nothing in the demeanor or content of these witness' testimony stands out to detract from their credibility. While there were some minor inconsistencies between the affidavits and live testimony in some of their cases ... there were no glaring inconsistencies." However, the Magistrate

Judge nevertheless concluded that the testimony of these witnesses "does not provide any direct proof that Armstead lied regarding Byrd's admissions." The Magistrate Judge was absolutely wrong.

As Ohio's Jury Instructions define it, "direct evidence is the testimony given by a witness who has seen or hear the facts to which he testifies." OJI 405.05(3). Abdul Mughni testified that after Jordan and Armstead testified, he heard them "bragging about how they got it off, you know, some of the stuff they had fabricated ... they was going to get cut free, get cut loose." Elwood Jones testified that he talked to Armstead after Byrd's trial when both were in the county jail. Armstead told Jones at that time that the trial testimony he gave against Byrd was false. Oliver Duff testified that he overheard Armstead and Jordan talking in the law library about how they were going to work the Byrd case for the prosecutor. Duff heard Jordan and Armstead saying they were having problems working the case because neither Byrd nor Brewer would communicate with them. Henry O'Hara testified that Virgil Jordan, his cellmate, told him that the information Jordan, Armstead, and Marvin Randolph had presented "wasn't true." In light of the fact that the testimony of each witness was based on what he *personally observed,* the testimony of these witnesses was "direct" as direct evidence can ordinarily get.

## D. THE CONCLUSION THAT ANY EVIDENCE OF PERJURED TESTIMONY WAS NOT "NEW EVIDENCE" AS REQUIRED BY *SCHLUP v. DELO* WAS LEGALLY ERRONEOUS.

The Magistrate Judge concluded in error that the testimony concerning Armstead's perjured testimony was not "new" evidence within the meaning of the Su-

preme Court's decisions in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992) and *Calderon v. Thompson,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998) because it could have been presented earlier in Byrd's first habeas petition. The Magistrate Judge therefore concluded that he was barred from considering the credible evidence of Armstead's lies. The Magistrate Judge was again absolutely wrong.

This is not a matter of gradation or a different but reasonable reading of the decisions the Magistrate Judge cited. The decisions cited by the Magistrate Judge speak with one voice on this issue: "[A] claim of innocence must be based on reliable evidence not presented *at trial.*" *Calderon,* 523 U.S. at 559, 118 S.Ct. 1489 (emphasis added). In *Schlup,* the Court likewise stated that "a claim [of actual innocence] requires petitioner to support his allegations ... with new reliable evidence ... that was not presented *at trial.*" *Schlup,* 513 U.S. at 324, 115 S.Ct. 851 (emphasis added). In *Sawyer,* the Court considered evidence of an inmate's innocence of his death penalty specification which included mitigating evidence that could have been but was not raised *at trial.* *Sawyer,* 505 U.S. at 347–48, 112 S.Ct. 2514 (emphasis added).

As the district court held in *Reasonover v. Washington,* 60 F.Supp.2d. 937 (E.D.Mo.1999), it is inappropriate to define new evidence of actual innocence as only evidence that could not have been discovered earlier in the exercise of reasonable diligence "because the actual innocence exception does permit a federal habeas court to review the merits of a constitutional claim, notwithstanding that the claim is abusive, successive, or otherwise procedurally barred." *Id.* at 947. The Armstead witnesses who testified at the hearing were not presented at trial and, as such, there was no procedural bar to the consideration of this evidence exposing Ronald Armstead's perjured testimony. It follows then that the Magistrate Judge's reasoning on this and other points of law was not only patently wrong but quite reckless in that it resulted in the out of hand dismissal of credible evidence that Byrd's conviction and death sentence were constitutionally infirm.

## III.

As this dissenting opinion most likely represents the last word of this court with regard to John W. Byrd, Jr., it seems to me appropriate at this point to sum up, as clearly as I can, what has happened in this case. At bottom, nearly 20 years of hard fought and acrimonious litigation is reduced to one simple fact. We will soon kill a man despite the absence of any physical or other evidence against him save the word of one Ronald Armstead, a confessed heroin addict, sex offender, violent felon, and infamous government informant.

## A. THE EVIDENCE HERE IS SHAMEFULLY INADEQUATE TO SUPPORT THE WEIGHT OF A CAPITAL CONVICTION.

### *(1) No Murder Weapon*

The work knife police found in the console of the van was never identified as the murder weapon. The trial court concluded in Byrd's state post-conviction proceedings that "the knife introduced at trial was not identified at trial as the murder weapon."

### *(2) No Blood Evidence*

According to the state trial judge, "The source of the blood which was tested and testified to at trial was not crucial to proof of defendant's guilt...." As a matter of law, the Court finds that the source of the

blood stains on petitioner's pants was not a determinative issue at trial. This court accorded this finding the presumption of correctness. *Byrd v. Collins*, 209 F.3d 486, 525 (6th Cir.2000).

### (3) No Physical Description

Monte Tewksbury, before he died, gave a physical description of his assailant as a man wearing a plaid shirt. It is undisputed that on the night of the robberies and murder, John Byrd wore a blue and white horizontal striped sweater and navy blue slacks. The U–Totem witnesses described the knife-wielder as wearing tan pants and a red and black jacket. Thus, Byrd's clothing did not match the description Tewksbury himself gave to the police of the murderer. Likewise, tan and blue are simply too far apart on the color spectrum to support any kind of circumstantial bridge to prove that John Byrd stabbed Monte Tewksbury

### (4) No Fingerprint or Eyewitness Evidence

One of the two robbers vaulted over the King Kwik store counter where Monte Tewksbury stood, leaving prints of his gym shoe on the cash register. It is undisputed that both of the prints were made by John Brewer's shoes rather than Byrd's. There was no eyewitness to the King Kwik murder or robbery.

### (5) No Money or Possessions

Sheriff's deputies arrested Byrd with a mere $4.76 on his person on the night of the murder and convenience store robberies. Brewer, on the other hand, had in his possession a $20 bill, two $10 bills, four $5 bills, 29 $1 bills and a substantial amount of loose change. The state prosecutor contended that a gold Pulsar watch worn by Tewksbury was taken from Byrd when he arrested. However, in a somewhat puzzling series of events, the Sheriff's Department somehow released or lost the watch. The state was never able to show that the watch taken from Byrd was in fact Mr. Tewksbury's.[1]

### B. THE TESTIMONY OF RONALD ARMSTEAD WAS PERJURED.

In light of the absence of physical evidence pointing to Byrd, his capital conviction and sentence rest necessarily on the testimony of Ronald Armstead. In a letter to the state Adult Parole Authority, Prosecuting Attorney Daniel Breyer wrote "I am firmly convinced that, without Mr. Armstead's cooperation and assistance, the prosecution of John Byrd, Jr., would have concluded with a much less favorable result." This court seemed to agree, observing that "All agree that Armstead's testimony was vitally important to the jury's determination that Petitioner was the principal offender in the aggravated murder of Monte Tewksbury." *Byrd v. Collins*, 209 F.3d at 499 (6th Cir.2000).

Throughout these proceedings, Byrd has brought forward considerable evidence to establish that Armstead's testimony was a lie. As noted earlier, four witnesses, whom the Magistrate Judge found credible, testified at the hearing that Armstead and Jordan told them their testimony against Byrd was false. Even aside from the testimony of these witnesses, Armstead's testimony collapses of its own implausibility. It is inconceivable that in the midst of the racially polarized Cincinnati Workhouse, Byrd, at the time a confessed

---

1. That the watch was not even produced at trial did not stop the Magistrate Judge from making the reckless and unsupported conclusion that "A Pulsar watch was taken from Byrd when he was booked into the jail and there is no testimony that Byrd usually wore such a watch."

white supremacist, would have found in Armstead, a black man and well-known snitch, a trustworthy confidant.

Not only was the jailhouse confession a complete and total fabrication, but Armstead similarly lied about his legal status at the time of the trial. His testimony gave the deliberate impression that he faced an imminent release from prison, and therefore had no reason to testify against Byrd. Indeed, when asked about his legal status, Armstead told the jury, "I got my time in March the 15 and I don't have no time pending or nothing else pending." *Byrd v. Collins*, 209 F.3d at 502. He stated again that "I got about two more weeks before my time is up." *Id.* In truth, Armstead faced up to 15 years imprisonment for a parole violation, and prior to his testimony against Byrd, the state prosecutor lobbied strongly against an early release. Nevertheless, a mere 11 days after Byrd was sentenced to die, Prosecuting Attorney Daniel Breyer informed the state parole board that it did not object to an early release, and shortly thereafter, Armstead went home.

### C. THE COURTS HAVE ALLOWED BYRD'S CONVICTION TO STAND DESPITE FLAGRANT CONSTITUTIONAL ERROR.

That some are prepared to send a man to his death on such drivel is just shameful. To be sure, our Constitution does not require this result. Byrd's conviction and sentence are undermined by constitutional error as the following egregious examples demonstrate.

### (1) False Evidence

As demonstrated in the previous discussion regarding Ronald Armstead, the prosecutors concealed evidence of innocence and presented evidence they knew to be false. Because the withholding of evidence

seriously undermining the testimony of a central witness, and providing a specific reason to fabricate testimony, falls squarely within the constitutional prohibitions recognized in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), Byrd's conviction and sentence are constitutionally infirm. *See East v. Johnson*, 123 F.3d 235, 239 (5th Cir.1997) (holding that "when the withheld evidence would seriously undermine the testimony of a key witness or there is no strong corroboration, the withheld evidence has been found to be material.").

### (2) Improper Vouching

The conduct of the state prosecutor at trial violated the constitutional prohibition against vouching for the credibility of a critical witness. The prosecution attempted to convince the jury of the believability of Armstead's representations. During closing argument, and with a shocking disregard for the constitutional impropriety of his conduct, the prosecutor pledged:

> I believe Armstead when he took the stand, and believe you did, too. . . .
>
> I have heard no evidence direct or circumstantial to contradict what Armstead said. I believe him and submit that you should believe him. . . .
>
> Witnesses pay a price to testify. I never met Armstead before, but you know there's something real genuine about our people. . . .

It is a long-established rule that prosecutorial testimony on the credibility of a witness is constitutionally impermissible. In a case that turns on the veracity of that witness, such conduct is *absolutely prejudicial*. *United States v. Bess*, 593 F.2d 749, 753 (6th Cir.1979) (ordering new trial after prosecutor stated that he "believe[d] beyond a reasonable doubt" that the defendant committed the crime charged); *United States v. Kerr*, 981 F.2d 1050, 1053 (9th

**528**

Cir.1992) (finding improper vouching when prosecutor stated, "I think [the witness] was candid. I think he is honest"); *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir.1994) ("We cannot overstate the extent to which we disapprove of this sort of improper vouching by prosecutors.)".

## IV.

In the many years this case has been in litigation, I have had ample time to consider why this court has so often refused to reverse the serious errors in judicial process which are now certain to send John Byrd to his death. I presume that others are aware of the sparse physical evidence in this case as well as the dubious testimony of witness Armstead. The record, taken as a whole, simply does not produce the moral certainty the imposition of the death sentence requires.

But I am reminded of the observation of Justice Douglas in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) that "It is the poor, the sick, the ignorant, the powerless and the hated who are executed." *Id.* at 251, 92 S.Ct. 2726 (Douglas, J. concurring). How disappointing it is that this poignant insight of Justice Douglas is relevant some thirty years later to explain why the courts stand idly by while prosecutorial chicanery and a foul-mouthed liar combine to send a man to the gallows. This is most unacceptable in a nation that begins and ends with the acknowledgment of the inalienability of human life—all human life. I am witness today to the truth observed in *Herrera v. Collins*, 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) that "[i]t is an unalterable fact that our judicial system, like the human beings who administer it, is fallible." *Id.* at 415, 113 S.Ct. 853. Indeed, in spite of our much vaunted legal acronyms and code sections, ours is a human system bounded by limited powers of reason and self-control and easily swayed by passion. Nevertheless, until we end this foolish "tinker[ing] with the machinery of death," *Callins v. Collins*, 510 U.S. 1141, 1145, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (Blackmun, J. dissenting), we have simply got to do better. I respectfully dissent.