UNITED STATES of America,
Plaintiff,

v.

[1] Hector Oscar ACOSTA MARTINEZ,
[2] Joel Rivera Alejandro,
Defendants.

No. Crim.99–044 SEC.

United States District Court,
D. Puerto Rico.

July 17, 2000.

Guillermo Gil, U.S. Attorney, John R. Teakell, Assistant U.S. Attorney, District of P.R., San Juan, PR, for plaintiff.

M. Cristina Gutierrez, Baltimore, MD, Hector A. Deliz, Hato Rey, PR, for defendant Acosta Martinez.

Steve M. Potolsky, Miami, FL, Rafael F. Castro Lang, San Juan, PR, for defendant Rivera Alejandro.

## OPINION AND ORDER

CASELLAS, District Judge.

Defendants Héctor Oscar Acosta Martínez and Joel Rivera Alejandro stand accused for the commission of crimes punishable by death. They have moved to declare the federal death penalty inapplicable in the Commonwealth of Puerto Rico. Because the Court concludes that the Federal Death Penalty Act of 1994, as amended, 18 U.S.C. § 3591 *et seq.* is "locally inapplicable" within the purview of section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734, and because applying the federal death penalty in Puerto Rico unilaterally, without the consent of its people, violates defendants' substantive due process of law, it **GRANTS** defendants' motion (**Docket # 247**).[1]

1. While the issue of the applicability of the federal death penalty in the Commonwealth of Puerto Rico has not been ruled upon by any trial or appellate court in Puerto Rico or elsewhere, its uniqueness and importance have been recognized by scholarly comment. As recently noted by Rory K. Little, Associate Professor of Law at Hastings College of the Law, University of California, and former member of the Department of Justice Capital Case Review Committee:

Perhaps the most interesting sovereignty and federalism questions arise in Puerto Rico, whose Constitution expressly prohib-

### I

Defendants were charged on June 2, 1999, with violating, *inter alia*, 18 U.S.C. § 924(j) (firearm murder in relation to a crime of violence) and 18 U.S.C. § 1513(a)(1)(B) (killing a person in retaliation for providing law enforcement officials with information relating to the possible commission of a federal offense), offenses which are both punishable by death. (**Docket # 83**). On January 24, 2000, the Attorney General of the United States authorized the United States Attorney for the District of Puerto Rico to seek the death penalty against defendants in the event of conviction. Thereafter, the government filed its notice of intent to seek the death penalty. (**Docket # 221**). On May 17, 2000, defendant Rivera Alejandro filed the instant motion (**Docket # 247**), which defendant Acosta Martínez adopted (**Docket # 250**).

Though not necessarily in this order, defendants make essentially four arguments in challenging the applicability of the federal death penalty in Puerto Rico: (1) that because the Constitution of the Commonwealth of Puerto Rico expressly prohibits capital punishment,[2] the federal death penalty is "locally inapplicable" within the meaning of section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734; (2) that as part of the bilateral agreement governing the federal government's relations with Puerto Rico, the Commonwealth Constitution, even if considered a federal statute, may not be unilaterally altered by Congress; (3) that applying the federal death penalty to citizens of Puerto Rico,[3] without their consent, and in view of their lack of representation in

---

its capital punishment. Puerto Rico is not a State, but it does constitute one of the 94 federal districts in the United States. Because of Puerto Rico's commonwealth relationship with the United States, Congress effectively had to approve its constitution when accepting the relationship. Thus, it can be argued that Congress has effectively stated two competing policies for Puerto Rico: prohibition of capital punishment in the constitutional document, while providing applicable death penalties in the 1988 and 1994 federal statutes. Moreover, because violent crime is unfortunately prevalent in Puerto Rico, the local authorities have entered into a "Memorandum of Understanding" with the local U.S. Attorney's office, agreeing that the federal authorities will prosecute much of the "local" violent crime, such as car-jackings, in Puerto Rico. As a result, **the Puerto Rico U.S. Attorney's Office has submitted the largest number of potential death penalty cases (59) of any of the 94 federal districts since the Capital Case Review protocol was issued in 1995.** Yet, the local, largely Catholic population opposes capital punishment. The effect, if any, of this complex set of facts on federal death penalty prosecutions remains uncertain.
Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb.L.J. 347, 357 n. 36 (1999) (emphasis added).

2. Article II, § 7 of the Commonwealth Constitution in relevant part provides: "The right to life, liberty and the enjoyment of property is recognized as a fundamental right of man. **The death penalty shall not exist.**" P.R. Const. art. II, § 7.

3. The term "citizens of Puerto Rico" as occasionally used in this opinion has the meaning set forth in § 5a of the Puerto Rican Federal Relations Act, 48 U.S.C. § 733a (defining "citizens of Puerto Rico" as "[a]ll citizens of the United States who have resided or who shall after March 4, 1927, reside in the island for one year"). Puerto Ricans were granted United States citizenship in 1917, with the enactment of the Organic Act of 1917, commonly known as the Jones Act, 39 Stat. 951 (1917). Subsequently, in 1952, Congress enacted the Immigration and Nationality Act, 8 U.S.C. §§ 1110 *et seq.* (hereinafter the "INA"). The INA defines "[t]he term 'United States,' ... [as] the continental United States, Alaska, Hawaii, Puerto Rico, Guam, and the Virgin Islands of the United States." *Id.* at § 1101(a)(38). The INA further declares all persons born in Puerto Rico to be "citizens of the United States at birth." *Id.* at § 1402. For a history of the granting of United States citizenship to Puerto Rico, see generally José Cabranes, *Citizenship and the American Empire* (1979). As to the existence and nature of Puerto Rican citizenship, see *Ramírez de Ferrer v. Mari Bras*, —— P.R.Dec. —— (1997), 97 J.T.S. 134. It is not challenged in this case that defendants are both citizens of Puerto Rico.

the enactment of Federal law, is unfair; and (4) that the applicability of the federal death penalty in the Commonwealth of Puerto Rico violates Article X of the Treaty of Paris, 30 Stat. 1754, 1759–60 (1899), which, at the time Spain ceded sovereignty over Puerto Rico to the United States, guaranteed the inhabitants of Puerto Rico the free exercise of their religion.

Defendants' second argument is in part premised on the theory that the Constitution of the Commonwealth of Puerto Rico is a statute of Congress. This theory has been repeatedly rejected by the First Circuit Court of Appeals, *see United States v. Quinones*, 758 F.2d 40, 42 (1st Cir.1985); *Figueroa v. People of Puerto Rico*, 232 F.2d 615, 620 (1st Cir.1956), and need not be revisited.[4] Defendants' argument is also based on yet another well settled point of law, i.e., that Congress may not unilaterally amend the Commonwealth Constitution. *See Quinones*, 758 F.2d at 42.[5] The relevant implications of the latter part of defendants' argument is addressed in the discussion below. Moreover, in

light of the Court's disposition of defendants' first and third arguments, it is unnecessary to address their fourth argument concerning the Treaty of Paris.[6]

## II

■ The legislative history of the relationship between Puerto Rico and the United States leading up to the establishment of the Commonwealth of Puerto Rico on July 25, 1952, has been recounted on numerous occasions,[7] and thus there is no need to rehash it here. Still, a few facts are worth reiterating. On July 3, 1950, Congress, "fully recognizing the principle of government by consent," adopted Pub.L. No. 600, "in the nature of a compact," to empower the people of Puerto Rico "to organize a government pursuant to a constitution of their own adoption." 64 Stat. 319, 319 (1950), 48 U.S.C. § 731b (hereinafter "Public Law 600"). In accordance with its terms, Public Law 600 was submitted to, and accepted by, the people of Puerto Rico in a referendum held on

**4.** Chief Judge Magruder's statement in *Figueroa v. People of Puerto Rico*, 232 F.2d 615 (1st Cir.1956) laid this issue to rest back in 1956:

> The answer to appellant's contention is that the constitution of the Commonwealth is not just another Organic Act of the Congress. **We find no reason to impute to the Congress the perpetration of such a monumental hoax.** Public Law 600 offered to the people of Puerto Rico a compact under which if the people accepted it, as they did, they were authorized to organize a government pursuant to a constitution of their own adoption.

> *Id.* at 620 (citation and internal quotation marks omitted).

**5.** Conversely, it is difficult to conceive a federal statute that can only be amended by the Puerto Rican people. *See* Const. P.R. art. VII, §§ 1, 2.

**6.** A germane issue would be whether customary international law forbids the application of capital punishment in Puerto Rico. However, since this issue is not fully briefed in defendants' motion, the Court shall refrain from considering it. For mixed views on whether the death penalty violates customary

international law, see generally, William A. Schabas, *International Law and Abolition of the Death Penalty*, 55 Wash. & Lee L.Rev. 797 (1998); Sonia Rosen & Stephen Journey, *Abolition of the Death Penalty: An Emerging Norm of International Law*, 14 Hamline J.Pub.L. & Pol'y 163 (1993); William S. Schabas, *The Abolition of the Death Penalty in International Law* (1993); Viktor Mayer–Schonberger, *Crossing the River of No Return: International Restrictions on the Death Penalty and the Execution of Charles Coleman*, 43 Okla.L.Rev. 677 (1990); Joan F. Hartman, *"Unusual" Punishment: The Domestic Effects of International Norms Restricting the Application of the Death Penalty*, 52 U.Chi.L.Rev. 655 (1983).

**7.** *See, e.g., Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 671–74, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *United States v. Lopez Andino*, 831 F.2d 1164, 1168 (1st Cir. 1987); *United States v. Quinones*, 758 F.2d 40, 41–42 (1st Cir.1985); *Cordova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan Bank, N.A.*, 649 F.2d 36, 39–41 (1st Cir.1981); *Moreno Rios v. United States*, 256 F.2d 68, 69–70 (1st Cir.1958); *Figueroa*, 232 F.2d at 617; *Mora v. Mejias*, 115 F.Supp. 610 (D.P.R. 1953).

June 4, 1951,[8] upon which a constitutional convention was called by the Legislature of Puerto Rico to draft a constitution.[9] A constitution was adopted by the people of Puerto Rico in a referendum held on March 3, 1952,[10] and subsequently transmitted, via the President, to Congress for approval. The Constitution was approved by Congress on July 3, 1952, conditional upon certain modifications. *See* Pub.L. No. 447, 66 Stat. 327, 327 (1952) (hereinafter "Public Law 447"). With the acceptance of Congress's conditions, the constitution was ultimately approved by the people of Puerto Rico,[11] "the compact became effective, and Puerto Rico assumed 'Commonwealth' status." *Examining Board of Engineers v. Flores de Otero*, 426 U.S. 572, 593–94, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). In sum, after 1952, Puerto Rico's status changed from that of a mere territory to the unique status of Commonwealth. And the federal government's relations with Puerto Rico changed from being bounded merely by the territorial clause, and the rights of the people of Puerto Rico as United States citizens, to being bounded by the United States and Puerto Rico Constitutions, Public Law 600, the Puerto Rican Federal Relations Act and the rights of the people of Puerto Rico as United States citizens.

*Cordova & Simonpietri Ins. Agency, Inc. v. Chase Manhattan Bank, N.A.*, 649 F.2d 36, 41 (1st Cir.1981) (Breyer, J.) (hereinafter *"Cordova"*).[12] Thereafter, the authority exercised by the federal government emanated from the compact entered into between the people of Puerto Rico and the Congress of the United States.[13]

**8.** *See* Law No. 27 of August 30, 1950, § 3(b), P.R.Laws 98, 100 (1951). Public Law 600 was accepted by 76.5% of the votes cast. *See* 3 José Trías Monge, *Historia Constitucional de Puerto Rico* 62 (1982).

**9.** *See* Law No. 1 of July 3, 1951, P.R.Laws 2–71 (1951). Initially, Congress's only requirements as to the content of the constitution were that it provide a republican form of government and that it include a bill of rights. *See* Pub.L. No. 600, § 2, 64 Stat. 319, 319 (1950), 48 U.S.C. § 731c. Subsequently, however, Congress conditioned the approval of the proposed constitution to various modifications. *See infra* pp. 320–21.

**10.** The Constitution was approved by 80% of the qualified voters who participated in the referendum. *See* 3 Trías Monge, *supra* note 8, at 270.

**11.** *See* Constituent Convention Res. No. 34 of July 10, 1952, *in* P.R.Laws Ann. tit. 1, at 144–46 (1982). Congress's conditions as incorporated into the Constitution were subsequently approved by the people of Puerto Rico in the general elections of 1952. *See* Proclamation of January 29, 1953, by Luis Muñoz Marín, Governor, Administrative Bulletin No. 30 (Jan. 29, 1953), *in* P.R.Laws Ann. tit. 1, at 147.

**12.** The compact between the people of Puerto Rico and the United States has been repeatedly recognized by the Supreme Court and the First Circuit Court of Appeals. *See Calero–Toledo*, 416 U.S. at 672, 94 S.Ct. 2080 (noting that the Commonwealth "is a political entity created by [Public Law 600] and with the consent of the people of Puerto Rico and joined with the United States of America under the terms of the compact") (citing *Mora v. Mejias*, 206 F.2d 377, 387 (1st Cir.1953)); *Quinones*, 758 F.2d at 42; *Cordova*, 649 F.2d at 40; *Caribtow Corp. v. Occupational Safety and Health Review Com'n*, 493 F.2d 1064, 1065 (1st Cir.1974); *Dario Sanchez v. United States*, 256 F.2d 73, 74 (1st Cir.1958); *Moreno Rios*, 256 F.2d at 70; *Figueroa*, 232 F.2d at 617; *Mora*, 206 F.2d at 387.

**13.** In *Harris v. Rosario*, 446 U.S. 651, 651–52, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980), the Supreme Court made reference to the Territorial Clause in holding that Congress "may treat Puerto Rico differently from states so long as there is a rational basis for its actions." However, in all the cases after *Harris* in which it has been confronted with an issue concerning the constitutional nature of the Commonwealth of Puerto Rico, the Court has in effect validated the existence of the compact, as well as the non-territorial nature of the Commonwealth. *See, e.g., Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 8, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982) ("Puerto Rico, like a state, is an autonomous political entity, 'sovereign over matters not ruled by the Constitution.' ") (quoting *Calero–Toledo*, 416 U.S. at 673, 94 S.Ct. 2080); *Posadas de Puerto Rico Assoc. v. Tourism Co. of Puerto Rico*, 478 U.S. 328, 339, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986) (citing *Calero–Toledo* with

Also as a result of the Commonwealth Constitution becoming effective on July 25, 1952, and as provided in Public Law 600, numerous provisions of the Organic Act of 1917, commonly known as the Jones Act, 39 Stat. 951 (1917), were repealed, and the remainder continued in force, now pursuant to the compact agreed upon between the people of Puerto Rico and Congress, as the Puerto Rican Federal Relations Act, 64 Stat. 319 (1950) (hereinafter the "PRFRA"). *See* Public Law 600, 64 Stat. at 319–20.[14]

From the onset, the new Commonwealth status spurred litigation concerning the applicability of Federal law to Puerto Rico.[15]

approval). Furthermore, the Court notes that the First Circuit has not interpreted *Harris* as in any way changing the well-settled law regarding the constitutional nature of the Commonwealth of Puerto Rico. *See, e.g., López Andino*, 831 F.2d at 1168; *Quiñones*, 758 F.2d at 42; *Córdova*, 649 F.2d at 39–41 (all decided after *Harris*).

For a different view, see Judge Torruella's concurring opinion in *López Andino*, 831 F.2d at 1172–77, stating that Puerto Rico constitutionally remains a territory after 1952. Judge Torruella's view was followed by the Eleventh Circuit in *United States v. Sánchez*, 992 F.2d 1143, 1151 (11th Cir.1993) to hold that "Puerto Rico is still constitutionally a territory, and not a separate sovereign," for purposes of the Double Jeopardy Clause. *But see Romero v. United States*, 38 F.3d 1204, 1208 (Fed.Cir.1994) ("On July 3, 1952, Congress approved the proposed Constitution of the Commonwealth of Puerto Rico, which thenceforth changed Puerto Rico's status from that of an unincorporated territory to the unique one of Commonwealth.") (citations omitted). The recent opinion in *Dávila–Pérez v. Lockheed Martin Corp.*, 202 F.2d 464, 469 (1st Cir.2000), wherein the First Circuit held that "Puerto Rico is still a territory for purposes of the Defense Base Act" is not to the contrary; this is a narrow ruling concerning statutory interpretation of the definitions within the Defense Base Act, 55 Stat. 622 (codified as amended at 42 U.S.C. §§ 1651–1654).

**14.** At the international level, on November 27, 1953, the General Assembly of the United Nations recognized, among other things, that "the people of the Commonwealth of Puerto Rico, by expressing their will in a free and democratic way, have achieved a new constitutional status," and further expressed the opinion that "the Association of the Commonwealth of Puerto Rico with the United States of America has been established as a mutually agreed association." G.A.Res. 748(VIII), UN GAOR, 8th Sess., 459th plen. mtg. ¶¶ 2, 3 (1953). Thus, the General Assembly deemed it appropriate that the United States cease transmission of information concerning Puerto Rico under Article 73(e) of the U.N. Charter. *See id.* The United States's position before the United Nations in this regard is of particular importance:

> The Federal Relations Act ... has continued provisions of political and economic union which the people of Puerto Rico have wished to maintain. In this sense the relationships between Puerto Rico and the United States have not changed. It would be wrong, however, to hold that because this is so and has been so declared in Congress, the creation of the Commonwealth of Puerto Rico does not signify a fundamental change in the status of Puerto Rico. The previous status of Puerto Rico was that of a territory subject to the full authority of the Congress of the United States in all governmental matters. The previous constitution of Puerto Rico was in fact a law of the Congress of the United States, which we called an Organic Act. Only Congress could amend the Organic Act of Puerto Rico. The present status of Puerto Rico is that of a people with a constitution of their own adoption, **stemming from their own authority**, which only they can alter or amend. The relationships previously established also by a law of the Congress, which only Congress could amend, have now become provisions of **a compact of a bilateral nature whose terms may be changed only by common consent.**

Hon. Frances P. Bolton & Hon. James P. Richards, *Report of the Eighth Session of the General Assembly of the United Nations* 241 (1954) (printed for the use of the Committee on Foreign Affairs, 83rd Cong., 2d Sess., Washington, D.C., U.S. Government Printing Office).

**15.** Even today, almost fifty years later, such litigation is not altogether uncommon. *See, e.g., TAG/ICIB Services, Inc. v. Pan American Grain Co., Inc.*, 215 F.3d 172, 177–78 (1st Cir.2000) (determining that the Interstate Commerce Commission Termination Act of 1995 applies to Puerto Rico); *Jusino Mercado v. Commonwealth of Puerto Rico*, 214 F.3d 34, 40–41 (1st Cir.2000) (holding that Puerto Rico, like the fifty states, is immune from federal damages actions brought by individuals under the Fair Labor Standards Act); *Dávila–Pérez*, 202 F.2d at 469 (holding that Puerto Rico is still a territory for purposes of the

In the context of this litigation, section 9 of the PRFRA, which in pertinent part provides that "the statutory laws of the United States **not locally inapplicable** ... shall have the same force and effect in Puerto Rico as in the United States," 48 U.S.C. § 734 (emphasis added), gained increased significance.[16] Since then, section 9 has been applied in some cases to hold federal statutes inapplicable to intra-Commonwealth activities.[17] And in *Guerrido v. Alcoa Steamship Co.*, 234 F.2d 349 (1st Cir.1956), the First Circuit reaffirmed its prior holding in *Lastra v. New York & Porto Rico S.S. Co.*, 2 F.2d 812 (1st Cir. 1924), that under section 8 of the PRFRA, 48 U.S.C. § 749, federal maritime law is locally inapplicable to Puerto Rico.[18] Moreover, Puerto Rico enjoys broad fiscal autonomy, as the internal revenue laws of the United States are not applicable in the Commonwealth. *See* 48 U.S.C. § 734.[19]

Still, most federal legislation considered by the courts—including both pre and post 1952 legislation—has been held applicable to Puerto Rico.[20] Perhaps it need not have been so, for after all, as Judge—now Justice–Breyer stated in *Cordova*, "the phrase ['not locally inapplicable' contained in section 9] reflects at least some intent that not only developing social and economic conditions but also emerging territorial self-government could render general fed-

Defense Base Act). But although "the legal relationship between Puerto Rico and the United States is far from clear and fraught with controversy," *López Andino*, 831 F.2d at 1168, it is not to be doubted that such relationship "has no parallel" in American constitutional history. *Examining Board v. Flores de Otero*, 426 U.S. 572, 596, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976).

16. In the context of Puerto Rican–Federal relations, the "not locally inapplicable" provision relates back to the first Organic Act of 1900, commonly referred to as the Foraker Act, 31 Stat. 77 (1900). However, the phrase has a much earlier origin, dating back to Henry Clay's Report of the Committee of Thirteen, the proposed Compromise of 1850, concerning slavery in New Mexico and other territories. *See Córdova*, 649 F.2d at 44 n. 38.

17. *See Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Co.*, 303 F.Supp. 414, 418–21 (D.P.R.1969) (Robinson–Patman Act); *Trigo Bros. Packing Corp. v. Davis*, 159 F.Supp. 841 (D.P.R.1958) (Federal Alcohol Administration Act), *vacated on other grounds*, 266 F.2d 174 (1st Cir.1959); *United States v. Figueroa Ríos*, 140 F.Supp. 376, 381–82 (D.P.R.1956) (Federal Firearms Act).

18. In *Lastra v. New York & Porto Rico S.S. Co.*, 2 F.2d 812 (1st Cir.1924), the First Circuit held that the rules of the admiralty and maritime law of the United States apply to Puerto Rico's navigable waters only to the extent that they are not locally inapplicable, either because they were not designed to apply to Puerto Rican waters, or because they have been rendered inapplicable by inconsistent Puerto Rican legislation. *See also Pérez*

de la Cruz v. Crowley Towing & Transport Co., 807 F.2d 1084 (1st Cir.1986); *Lusson v. Carter*, 704 F.2d 646 (1st Cir.1983); *García v. Friesecke*, 597 F.2d 284 (1st Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 292, 62 L.Ed.2d 306 (1979); *Mojica v. Puerto Rico Lighterage Co.*, 492 F.2d 904 (1st Cir.1974); *Alcoa Steamship Co. v. Pérez Rodríguez*, 376 F.2d 35 (1st Cir.), *cert. denied*, 389 U.S. 905, 88 S.Ct. 215, 19 L.Ed.2d 219 (1967); *Fonseca v. Prann*, 282 F.2d 153 (1st Cir.1960); *Reeser v. Crowley Towing & Transportation Co., Inc.*, 937 F.Supp. 144 (D.P.R.1996).

19. As aptly noted by Chief Judge Magruder: "The people of Puerto Rico were thus not to be taxed for the support of the general government in Washington so it could not be said that there was taxation without representation." Magruder, *The Commonwealth of Puerto Rico*, 15 U.Pitt.L.Rev. 1, 7 (1953).

20. *See, e.g., Pan American Grain*, 215 F.3d 172, 177–78 (Interstate Commerce Commission Termination Act); *United States v. Rivera Torres*, 826 F.2d 151, 154 (1st Cir.1987) (Clean Water Act); *United States v. Quiñones*, 758 F.2d 40, 43 (1st Cir.1985) (Omnibus Crime Control and Safe Streets Act); *United States v. Tursi*, 655 F.2d 26, 27 (1st Cir.1981) (Youth Corrections Act); *National Labor Relations Board v. Security Nat'l Life Ins. Co.*, 494 F.2d 336, 338 (1st Cir.1974) (National Labor Relations Act); *Caribtow Corp. v. Occupational Safety and Health Review Com'n*, 493 F.2d 1064, 1068 (1st Cir.1974) (Occupational Safety and Health Act); *Moreno Ríos v. United States*, 256 F.2d 68, 73 (1st Cir.1958) (Narcotic Drugs Import and Export Act); *Hodgson v. Unión De Empleados De Los Supermercados Pueblos*, 371 F.Supp. 56, 61 (D.P.R.1974) (La-

eral law inapplicable." 649 F.2d at 44 n. 38; *see also United States v. Figueroa Rios,* 140 F.Supp. 376, 381 (D.P.R.1956) (noting that, after the establishment of the Commonwealth, section 9 acquired new "vitality"); *Liquilux Gas Services of Ponce, Inc. v. Tropical Gas Co.,* 303 F.Supp. 414, 418–21 (D.P.R.1969) (same).[21]

Probably the case involving the controversy most akin to the one at hand is *United States v. Quinones,* 758 F.2d 40 (1st Cir.1985). In *Quinones,* defendant moved to suppress a telephone conversation between him and a codefendant recorded pursuant to the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510 *et seq.* (hereinafter "Title III"). The district court denied the motion and convicted defendant after a bench trial. On appeal, defendant challenged the applicability in Puerto Rico of Title III, grounded on the Commonwealth Constitution's prohibition against wiretapping. *See* P.R. Const. art. II, § 10. Defendant argued "that the Constitution of the Commonwealth should be considered a federal law—an organic act and that its prohibition against wire-tapping controls because

it has the force of federal law." *Quinones,* 758 F.2d at 41 (internal quotation marks omitted). In its opinion, the circuit court first rejected defendant's "federal law-or-ganic Act" theory reiterating the well-settled law that the Commonwealth Constitution is not a statute of Congress. *Id.* at 42.[22] Second, the court concluded that "[t]he intent behind the approval of the Puerto Rico Constitution was that the Constitution would operate to organize a local government and its adoption would in no way alter the applicability of United States laws and federal jurisdiction to Puerto Rico." *Id.* at 43 (citation omitted). Accordingly, the court held Title III applicable to Puerto Rico. *See id.* ("The Omnibus Crime Control Act is the controlling law for federal prosecutions in Puerto Rico.").[23]

Two important elements, however, make this case substantially distinguishable from *Quinones.* First and foremost, is the **"fundamental principle that death is different...."** *Schiro v. Farley,* 510 U.S. 222, 238, 114 S.Ct. 783, 127 L.Ed.2d 47, *reh'g denied,* 510 U.S. 1215, 114 S.Ct. 1341, 127

---

bor–Management Reporting and Disclosure Act).

**21.** The events culminating in the establishment of the Commonwealth, together with the coming into effect of its own Constitution, are commonly depicted as a further step along the road toward increased self-governance. *See, e.g., Córdova,* 649 F.2d at 40 ("The theme that consistently runs throughout the legislative history of Puerto Rico's attainment of Commonwealth status is that Commonwealth represents the fulfillment of a process of increasing self-government over local affairs by the people of Puerto Rico."). While the attainment of a fuller measure of self-government over local affairs is not to be negated as a result of the change to Commonwealth status, the key to understanding the nature of such change should rather be the principle of consent. *See* José Trías Monge, *Plenary Power and the Principle of Liberty: An Alternative View of the Political Condition of Puerto Rico,* 68 Rev.Jur.U.P.R. 1, 28 (1999) ("The change did not alone consist in the obt[ainment] of self-government, but particularly in the fact that **such consent became the basis of the relationship** [with the federal government].") (emphasis added) (hereinafter *"Plenary Pow-*

*er "*). **It is on this basis that section 9 should be interpreted and applied.**

**22.** As stated by the *Quiñones* court:

[I]n 1952, Puerto Rico ceased being a territory of the United States subject to the plenary powers of Congress as provided in the Federal Constitution. The authority exercised by the federal government emanated thereafter from the compact itself. Under the compact between the people of Puerto Rico and the United States, Congress cannot amend the Puerto Rico Constitution unilaterally, and the government of Puerto Rico is no longer a federal government agency exercising delegated power. 758 F.2d at 42 (citing *Mora v. Mejías,* 206 F.2d 377, 386–88 (1st Cir.1953)).

**23.** This same issue had already been considered and ruled upon by this Court, almost in the same manner as in *Quiñones,* in *United States v. Ortiz Pérez,* 465 F.Supp. 1284 (D.P.R. 1979). After *Quiñones,* the issue was revisited in a civil context in *Camacho v. Autoridad de Teléfonos de Puerto Rico,* 868 F.2d 482, 487–88 (1st Cir.1989), yielding no different results.

L.Ed.2d 688 (1994) (Blackmun, J. dissenting) (emphasis added and internal quotation marks omitted).[24] It is beyond dispute that death is qualitatively **"different from all other punishments a society inflicts upon its citizens."** *Callins v. Collins,* 510 U.S. 1141, 114 S.Ct. 1127, 1133, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). As Justice Stewart noted almost three decades ago:

> The penalty of death differs from all other forms of criminal punishment, **not in degree but in kind.** It is unique in its total **irrevocability.** It is unique in its rejection of rehabilitation of the convict as a basic purpose of criminal justice. And it is unique, finally, in its absolute renunciation of all that is embodied in our concept of humanity.

*Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (concurring opinion) (emphasis added). This qualitative difference of death as punishment creates a heightened need for fairness, consistency and reliability it its administration. "Beginning with *Furman,* the Court has attempted to provide standards for a constitutional death penalty that would serve both goals of measured, consistent application and fairness to the accused." *Eddings v. Oklahoma,* 455 U.S. 104, 111, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982).[25]

Second and also important, contrary to Title III,[26] the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591 *et seq.* (hereinafter the "FDPA"), **is not specifically made extensive to the Commonwealth of Puerto Rico.**[27] The FDPA was enacted as

---

**24.** For other authorities noting the qualitative difference of death from any other punishment. see, for example, *Ford v. Wainwright,* 477 U.S. 399, 411, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (Marshall, J., plurality opinion); *Spaziano v. Florida,* 468 U.S. 447, 468, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984) (Stevens, J. joined by Brennan and Marshall, JJ., concurring in part, dissenting in part); *Eddings v. Oklahoma,* 455 U.S. 104, 109, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); *id.* at 117, 102 S.Ct. 869 (O'Connor, J., concurring; *Beck v. Alabama,* 447 U.S. 625, 637–38, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980).

**25.** *See, e.g., Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality opinion) (stressing that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty") *Lockett v. Ohio,* 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion) (noting that "th[e] qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed") (invalidating a death penalty statute that did not permit the consideration of mitigating factors); *Coker v. Georgia,* 433 U.S. 584, 598, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (plurality opinion) (holding that because capital punishment "is unique in its severity and irrevocability," it may not be disproportionately and excessively imposed: it "is an excessive penalty for the rapist who, as such, does not take human life") (internal quotation marks and citation omitted); *Woodson v. North Carolina,*

428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion) (invalidating a mandatory death penalty statute in part because it failed "to allow the particularized consideration of relevant aspects of character and record of each convicted defendant before the imposition upon him of a sentence of death"); *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion) (stressing that the discretion of whether or not to impose the death penalty "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action").

**26.** *See* 18 U.S.C. §§ 2510(3) ("State" within the meaning of Title III includes the Commonwealth of Puerto Rico), 2511(1)(b)(v) (Title III's general prohibition extends to persons acting in Puerto Rico).

**27.** Notably, however, the FDPA established **special provisions for Indian country** which recognize the principle of government by consent:

> No person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country ... and which has occurred within the boundaries of Indian country, **unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.**

108 Stat. at 1968 (codified at 18 U.S.C. § 3598) (emphasis added).

Title VI of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, §§ 60002–60026, 108 Stat. 1959–82 (1994) (codified as amended at 18 U.S.C. §§ 3591–3598 and scattered sections), and became effective on September 13, 1994. It established procedures generally applicable to "any [federal] offense for which a sentence of death is provided," 108 Stat. at 1959 (codified at 18 U.S.C. § 3591(a)(2)), and . specifically authorized the death penalty for the commission of various existing offenses, *see* 108 Stat. at 1968–1982. Among the latter, are those offenses for which defendants stand accused in this case, to wit: firearm murder in relation to a crime of violence, *see id.* at 1973 (codified as amended at 18 U.S.C. § 924(j)), and killing a person in retaliation for providing law enforcement officials with information relating to the possible commission of a federal offense, *see id.* at 1975 (codified as amended at 18 U.S.C. § 1513(a)(1)(B)).

The FDPA, moreover, created two new federal crimes of terrorism punishable by death: violence against maritime navigation and violence against maritime fixed platforms. *See id.* at 1975–79 (codified as amended at 18 U.S.C. §§ 2280, 2281). The only mention of Puerto Rico in the FDPA is in connection with these offenses, where the term "United States" is defined "in a geographical sense" to include the Commonwealth of Puerto Rico. *See id.* at 1977, 1979 (codified as amended at 18 U.S.C. §§ 2280(e), 2281(d)).[28]

However, on a matter as unique and extreme as the death penalty, the mention of Puerto Rico exclusively in the context of these maritime offenses, **cannot reasonably be taken as Congress's manifest intention that the FDPA not fall within the "not locally inapplicable" provision set forth in section 9,** particularly in view of the Commonwealth Constitution's prohibition against capital punishment. The extraordinary nature of capital punishment requires a higher degree of clarity and precision. Reason and common sense dictate that had Congress intended to apply the death penalty in the Commonwealth, it would have done so by the plain declaration, and would not have left it to mere inference.[29]

At the time the framers of the Commonwealth Constitution drafted the provision prohibiting capital punishment, the death penalty had already been abolished in Puerto Rico since 1929.[30] The Framers, however, wished to make it abundantly clear that capital punishment would not

---

**28.** Federal jurisdiction over a crime of violence against maritime navigation, as the statute was originally enacted, seemingly did not lie if the proscribed activity took place in a state where such activity was already prohibited as a crime. *See* 108 Stat.1976. Therefore, had the activity been prohibited by Commonwealth law, federal jurisdiction would not have been obtaining. Arguably thus, Congress was not concerned with the possibility that federal jurisdiction over such a crime would not be uniformly exercised throughout the United States. Subsequently, however, Congress amended the statute's jurisdictional provision to strike out the savings clause ("and the activity is not prohibited as a crime by the State in which the activity takes place," *see* Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104–132, § 722(1), 110 Stat. 1214, 1299 (1996)), thereby allowing for the exercise of federal jurisdiction over a crime of violence against maritime navigation when the proscribed activity takes place "in the United States." 18 U.S.C. § 2280(b)(1)(A)(ii).

**29.** The Court is aware that the statutes involved in this case—i.e., 18 U.S.C. §§ 924(j) and 1513(a)(1)(B)—, which were amended through the FDPA to specifically authorize the death penalty, are, and have been, applied in Puerto Rico. Arguably then, in amending these statutes, there was no need for Congress to expressly indicate that the amendments were being made extensive to Puerto Rico. Certainly there would be no flaw in this reasoning had the amendments in question merely altered the degree of the penalty already available. But under the circumstances, such reasoning is unavailing, for "[t]he penalty of death differs from all other forms of criminal punishment, **not in degree but in kind.**" *Furman v. Georgia*, 408 U.S. 238, 306, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring opinion) (emphasis added).

**30.** *See* Law No. 42 of April 26, 1929, § 1, P.R.Laws 232, 232 (1929) ("The death penalty is hereby definitively abolished in Puerto Rico.").

exist under Commonwealth status.[31] In so doing, they were acting upon **the people of Puerto Rico's firm cultural, moral and religious convictions against the death penalty.**[32] *See* 4 *Diario de Sesiones de la Asamblea Constituyente* 1104–05, 1519, 2566 (Equity Publishing Corp. ed., 1961) (hereinafter *"Diario de Sesiones"*). Thus, the prohibition against the death penalty embodied in the Commonwealth Constitution unquestionably **"stands as an expression of the will of the Puerto Rican people."** [33] *Mora v. Mejias,* 206 F.2d 377, 382 (1st Cir.1953); *see also Figueroa v. People of Puerto Rico,* 232 F.2d 615, 620 (1st Cir.1956).

It must be noted that Congress conditioned its approval of the Commonwealth Constitution—approval which "was necessary to launch it forth," *Figueroa,* 232 F.2d at 620—upon: first, deletion of § 20 of Article II, a provision modeled after the Universal Declaration on Human Rights adopted by the United Nations recognizing, among others, the right to work, obtain an adequate standard of living, and social protection in sickness and old age; second, addition of a provision to § 5 of Article II concerning elementary private education; and third, addition of a provision to § 3 of Article VII requiring that any amendments to the Constitution be consistent with the United States Constitution, the Puerto Rican Federal Relations Act, and Public Law 600, which "was adopted by the Congress as a compact

**31.** During the debate concerning the capital punishment provision, one of the delegates of the Constituent Convention presented an amendment that would have enabled the Legislature to enact the death penalty as it later saw fit. The amendment was unanimously rejected. *See* 2 *Diario de Sesiones de la Asamblea Constituyente* 1510–24 (Equity Publishing Corp. ed., 1961) (hereinafter *"Diario de Sesiones"*). Subsequent attempts to introduce the death penalty in Puerto Rico have also led to a dead end. *See* Raúl Serrano Geyls, *La pena de muerte y el sistema de justicia,* 48 Rev.Jur.U.P.R. 3 (1979); Jorge Pérez Díaz, *Ponencia del Secretario de Justicia sobre la introducción en Puerto Rico de la pena capital (R. Conc. de la C. 49),* 63 Rev.Jur.U.P.R. 759 (1993). At the time the Commonwealth Constitution was adopted, the federal death penalty was available for extraordinary offenses involving national security, such as espionage and treason.

**32.** Puerto Rico's characteristic culture and traditions must not be overlooked. As Judge Torruella has pointed out:

[T]here seems to be no question that ... a "Puerto Rican culture" does exist. It is a concept generally accepted by a· considerable segment of Puerto Ricans as being representative of a number of common "national" values notwithstanding that those values may not be uniformly accepted across the full hierarchy of social and economic classes in Puerto Rican society....

As previously indicated, upon the arrival of General Miles' forces in 1898 they found a substantially homogeneous population, whose language was Spanish, which professed to worship under the Roman Catholic faith, and which was ethnically different from the Spanish metropolis notwithstanding that it may have originally served as its principal population source. Additionally, Spain was looked to as the *Madre Patria,* the fountain of culture and tradition. There were also a series of anthropological characteristics which distinguished the Puerto Rican population from that of the United States generally.

Juan R. Torruella, *The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal* 260–61 (1st ed.1985) (note omitted).

**33.** In its memorandum to the United Nations concerning the cessation of transmission of information under Article 73(e) of the U.N. Charter, the United States government recognized that "[t]he people of Puerto Rico have complete autonomy in internal economic matters and in cultural and social affairs under a Constitution adopted by them and approved by the Congress." *Memorandum by the Government of the United States of America Concerning the Cessation of Transmission of Information Under Article 73(e) of the Charter with Regard to the Commonwealth of Puerto Rico* at ¶ 22, Annex II, U.N. Doc. A/Ac.35/L.121 (1953) (hereinafter *"Memorandum"*). Upon this information, the United Nations expressed "that the agreement reached by the United States of America and the Commonwealth of Puerto Rico, in forming a political association which respects the individuality and the cultural characteristics of Puerto Rico, maintains the spiritual bonds between Puerto Rico and Latin America and constitutes a link in continental solidarity...." G.A. Res. 748(VIII), UN GAOR, 8th Sess., 459th plen. mtg. (1953).

with the people of Puerto Rico." Public Law 447, 66 Stat. at 327. Significantly, however, Congress voiced no objection to § 7 of Article II, which in relevant part provides that "[t]he death penalty shall not exist." P.R. Const. art. II, § 7 (emphasis added). Admittedly, nothing prevented Congress from conditioning approval of the Constitution upon deletion of this provision, as it did with § 20. Thus, the people of Puerto Rico, in voting to approve the Constitution, **had a reasonable expectation that the death penalty would not exist under Commonwealth status.**[34] The application of the FDPA in Puerto Rico is not only inconsistent with the compact, but **it is antithetic to it.** *Cf. Caribtow v. Occupational Safety and Health Review Com'n*, 493 F.2d 1064, 1065 (1st Cir.1974) (considering as "determinative" in the "not locally inapplicable" analysis whether the federal legislation sought to be applied to Puerto Rico is consistent with the compact).

In summary, (1) the purpose of establishing Commonwealth status in Puerto Rico was to develop and enhance self-government by the people of Puerto Rico and create an autonomous political entity; (2) in voting to accept Public Law 600—adopted by Congress as a compact with the people of Puerto Rico—the people of Puerto Rico accepted section 9 of the PRFRA, which provides for the applicability to the Commonwealth of all Federal law **if not locally inapplicable;** (3) the Commonwealth Constitution, which was adopted by the Puerto Rican people and approved by Congress, **expressly prohibits capital punishment in Puerto Rico;** (4) Puerto Rico's culture, traditions and values are **repugnant to the death penalty;** and (5) the FDPA was not specifically made extensive to Puerto Rico. Under these circumstances, the Court concludes that the FDPA **is locally inapplicable within the meaning of section 9 of the PRFRA.**[35]

### III

■ Even if the Court were to attribute to Congress the intention that the FDPA

---

34. It was also reasonable to expect that section 9, now approved for the first time by the people of Puerto Rico as provided by Public Law 600, *see* 64 Stat. at 319–20, would have new vigor in order to recognize and further greater self-governance. *See United States v. Figueroa Ríos*, 140 F.Supp. 376, 381 (D.P.R. 1956). The Elective Governor Act of 1947, Pub.L. No. 362, 61 Stat. 770 (1947), provided a mechanism with respect to the applicability of federal legislation to Puerto Rico:

> The President of the United States may, from time to time, after hearing, promulgate Executive orders **expressly excepting Puerto Rico from the application of any Federal law** not expressly declared by Congress to be applicable to Puerto Rico **which as contemplated by section 9 of this Act** [referring to section 9 as it was contained in the Jones Act] **is inapplicable by reason of local conditions.**

Pub.L. No. 362, § 6, 61 Stat. at 772. To implement this provision President Truman in 1948, appointed an Advisory Commission on the Relation of Federal Laws to Puerto Rico, whose duty was to "from time to time make recommendations to the President concerning the exercise of his power under [the provision] to exempt Puerto Rico from the application of Federal laws." Exec. Order No. 10,-005, 13 Fed.Reg. 5854 (1948). To that end,

the Commission was "authorized to examine into, and to hold hearing on, the inapplicability of Federal laws to Puerto Rico by reason of local conditions." *Id.* The Order further authorized and directed that "[a]ll executive departments and agencies of the Federal Government ... to cooperate with the Commission in its work and to furnish the Commission such information as the Commission may require in the performance of its duties." *Id.* Regrettably, this mechanism was not included in Public Law 600.

35. In its opposition to the instant motion, the government presses that "under the Supremacy Clause, the Federal death penalty statute preempts the Puerto Rico Constitution...." (**Docket # 267**, at 8). As a general proposition, this argument is correct. *See Camacho v. Autoridad de Teléfonos*, 868 F.2d 482, 488 (1st Cir.1989). In the instant case, however, it is inapposite. As a threshold matter, the Court must determine, as it has, whether the FDPA applies in Puerto Rico. Because the Court concludes that the FDPA is locally inapplicable within the meaning of section 9 of the PRFRA, there is no need to determine whether it preempts Article II, § 7 of the Commonwealth Constitution.

Moreover, even if applicable to Puerto Rico, the FDPA would not in this case preempt the

apply in Puerto Rico, such application would not comport with the exigencies of substantive due process. The keystone of Commonwealth status is **the principle of the consent of the governed.** It was so stated by Congress in laying the foundations upon which Puerto Rico's new status was to be built: "**fully recognizing the principle of government by consent,**" Congress declared in 1950, "this act [Public Law 600] is now adopted **in the nature of a compact** so that the people of Puerto Rico may organize a government pursuant to a constitution of their own adoption." 64 Stat. at 319, 48 U.S.C. § 731b (emphasis added). At first glance, Public Law 600 may be read merely as having furthered the right of the Puerto Rican people to constitute themselves, as a polity, according to their own design; that is, to establish a local government. A finer reading of its provisions, however, shows that Public Law 600 was not so narrow in scope; it also set forth the basis for a new relationship between the people of Puerto Rico and the United States.[36] As explained in Part II, *supra,* Public Law 600 did not come fully into force until its acceptance by the Puerto Rican people in an island-wide referendum. This acceptance also

signified that Puerto Ricans, for the first time, consented, through section 9 of the PRFRA, to be governed by federal laws not locally inapplicable, even though the citizens of Puerto Rico did not have, and still do not have, any participation in the enactment of such laws.[37]

Of course, the principle that government rests upon popular consent was nothing new at the time the basis for Commonwealth status was laid down in 1950. It can be traced in part to the Lockean [38] view of government held by America's Founders in the Declaration of Independence as one of few, yet fundamental, self-evident truths: "That to secure ... [certain unalienable] Rights [among which are life and liberty], **Governments are instituted among Men, deriving their just Powers from the Consent of the Governed....**" The Declaration of Independence para. 2 (U.S.1776). Thus, in the Founders' view, the rights to **life and liberty,** enjoyed equally by all, precede government; they are not derived from it, but obtained at birth. *See id.* ("all Men are created equal ... endowed by their Creator with certain unalienable rights"). It is for the protection of these rights, among others, that a people consent, out of their

---

Commonwealth constitutional provision prohibiting the death penalty, because only those federal statutes that comport with the Federal Constitution carry the weight accorded by the Supremacy Clause, *cf. Alden v. Maine,* 527 U.S. 706, 119 S.Ct. 2240; 2255, 144 L.Ed.2d 636 (1999), and the FDPA, as discussed in Part III, *infra,* is unconstitutional as applied to defendants.

**36.** This is how the delegates of the Constituent Convention viewed it, and eventually set it forth in the preamble to the Commonwealth Constitution:

We, the people of Puerto Rico, in order to organize ourselves politically on a fully democratic basis, to promote the general welfare, and to secure for ourselves and our posterity the complete enjoyment of human rights, placing our trust in Almighty God, do ordain and establish this Constitution for the commonwealth which, **in the exercise of our natural rights,** we now create **within our union with the United States of America.**

P.R. Const. preamble.

**37.** Puerto Ricans residing in Puerto Rico do not vote for the President of the United States, nor do they elect senators or representatives to the United States Congress, except for a non-voting Resident Commissioner for Puerto Rico who sits in the House of Representatives. The Resident Commissioner can vote in the Congressional committees to which he is assigned, *see* Rules of the House of Representatives, Rule XII, but he cannot cast a final vote on legislation proposed in the House.

**38.** "The liberty of man in society is to be under no legislative power but that established, by consent, in the commonwealth, nor under any dominion of any will or restraint of any law, but what that legislative shall enact according to the trust put in it." John Locke, *The Second Treatise of Government (An Essay Concerning the True, Original, Extent and End of Civil Government)* 13 (J.W. Gough ed., 1956) (1689).

own free will, to the institution of government. This moral reasoning provided the republic's foundation. In the words of Justice Chase:

> The people of the United States erected their Constitutions, or forms of government, to establish justice, to promote the general welfare, to secure the blessings of liberty; and to protect their persons and property from violence. The purposes for which men enter into society will determine the nature and terms of the social compact; and as they are the foundations of the legislative power, they will decide what are the proper objects of it.... An act of the Legislature (for I cannot call it a law) contrary to the great first principles of the social compact, cannot be considered a rightful exercise of legislative authority. The obligation of a law in governments established on express compact, and on republican principles, must be determined by the nature of the power, on which it is founded.

*Calder v. Bull,* 3 U.S. (3 Dall.) 386, 388, 1 L.Ed. 648 (1798).[39]

The United States Constitution, conceived in great measure in the spirit of the Declaration of Independence, is but a logical extension of the principle of government by consent: "We the People of the United States, in Order to ... secure the Blessings of Liberty ... do ordain and establish this Constitution for the United States of America." U.S. Const. preamble.

Thus, "our system of government rests on one overriding principle: All power stems from the consent of the people." *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 846, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Thomas, J., dissenting, joined by Rehnquist, C.J., and O'Connor and Scalia, JJ.). It is the people who "empower the governmental institutions of the United States." *Id.* at 849, 115 S.Ct. 1842.

But "the notion of popular sovereignty" not only "undergirds the [Federal] Constitution," *id.,* it is also embodied in the Commonwealth Constitution approved by Congress, both in the Preamble ("We [the people of Puerto Rico] understand that the democratic system of government is one in which **the will of the people is the source of public power** ...."), and in Article I ("[The Commonwealth's **political power emanates from the people** and shall be exercised in accordance with their will, within the terms of the compact agreed upon between the people of Puerto Rico and the United States of America.]"). P.R. Const. preamble, art. I. Moreover, in approving the Constitution of the Commonwealth, the Constituent Convention expressed that upon the Constitution becoming effective, the people of Puerto Rico would be "organized in a commonwealth established within the terms of the compact **entered into by mutual consent, which is the basis of our union with the United States of America.**" Res. No. 23 of February 4, 1952, *in* 4 *Diario de Sesiones, supra,* at 2410.[40]

---

**39.** It has been noted that,

> [t]oday the justices of the Supreme Court will apply strict forms of review under the due process clauses and the equal protection clause to any governmental actions which limit the exercise of **"fundamental" constitutional rights.** These are rights which the Court recognizes as having **a value so essential to individual liberty** in our society that they justify the justices reviewing the acts of other branches of government in a manner quite similar to the substantive due process approach of the pre–1937 period. Little more can be said to accurately describe the nature of a fundamental right, because fundamental rights analysis is simple no more than the modern

recognition of the natural law concepts first espoused by Justice Chase in *Calder v. Bull.*

2 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 15.7, at 427–28 (2d ed.1992).

**40.** The nature of the relationship between the people of Puerto Rico and the United States, as premised upon the principle of consent, was also recognized by the United Nations in 1953, when the General Assembly determined that the United States could cease transmitting information concerning Puerto Rico under Article 73(e) of the Charter. *See* G.A.Res. 748(VIII), UN GAOR, 8th Sess., 459th plen. mtg. ¶ 3 (1953) (expressing the opinion that "the Association of the Commonwealth of

Yet today, almost fifty years after the Commonwealth was established, the principle of the consent of the governed, in the case of Puerto Rican–Federal relations, has been **substantially eroded,** largely due to the **widening** sphere of federal authority, which has expanded without local participation, and the concomitant **reduction** in the sphere of Commonwealth authority. At the time the Commonwealth was established, the application of federal laws was not so widespread. But the Great Society legislation of the 1960's marked a take-off point for a sustained increase in federal legislation applicable

not only to the states, but to Puerto Rico as well.

During the last four decades, the Commonwealth leadership has embarked, together with federal government officials, in efforts to revise the terms of the compact[41] and address the democratic deficiency[42] created by the unilateral application of Federal law to Puerto Rico without the participation of its people.[43] Puerto Rico has formally requested changes in the terms of its association with the United States **on at least ten occasions to no avail;** in the end, Congress has turned a deaf ear on all.[44]

Puerto Rico with the United States of America has been established **as a mutually agreed association**"); *see also Memorandum, supra* note 33, at ¶ 24.

**41.** It must be noted that in approving the Commonwealth Constitution, the people of Puerto Rico expressly reserved "**the right to propose and to accept modifications** in the terms of its relations with the United States of America, in order that these relations ... [would] at all times be the expression of an agreement freely entered into between the people of Puerto Rico and the United States of America." Res. No. 23 of February 4, 1952, *in* 4 *Diario de Sesiones, supra* note 31, at 2410. In 1953, moreover, the General Assembly of the United Nations expressed its assurance that,

in accordance with the spirit of the present resolution, the ideals embodied in the Charter of the United Nations, the traditions of the people of the United States of America and the political advancement attained by the people of Puerto Rico, due regard will be paid to the will of both the Puerto Rican and American peoples in the conduct of their relations under their present legal statute, **and also in the eventuality that either of the parties to the mutually agreed association may desire any change in the terms of this association.**

G.A.Res. 748(VIII), UN GAOR, 8th Sess., 459th plen. mtg. ¶ 9 (1953).

**42.** As Dr. David M. Helfeld, leading constitutionalist and former dean of the University of Puerto Rico School of Law, has noted:

From the perspective of democratic theory, the principal defect in the constitutional relations between Puerto Rico and the United States can be traced to Section 9 which authorizes Congress to legislate unilaterally for Puerto Rico. As I see it, Puerto Rico can

live indefinitely with the idea that it has given its consent to be bound by the fundamental rights of the Constitution, but ought not to continue accepting as a permanent condition of constitutional relations Congress' unilateral authority to legislate as defined in Section 9.

Dr. David M. Helfeld, *How Much of the United States Constitution and Statutes Are Applicable to the Commonwealth of Puerto Rico?,* 110 F.R.D. 452, 467–68 (1986) (footnote omitted).

**43.** As recently expressed by former Chief Justice of the Supreme Court of Puerto Rico, José Trías Monge:

Section 9 of the Federal Relations Act provides that all federal laws not locally inapplicable shall have the same force and effect in Puerto Rico as in the United States, except the internal revenue laws. The people of Puerto Rico do not participate in the making of such laws, nor their application is made subject to their specific consent.... Under the compact Puerto Rico indeed achieved a very large measure of self-government, but it fell short of decolonization, which is why so many decades were spent by the Commonwealth leadership in efforts to revise the terms of Puerto Rico's relationship with the United States. It is true that the people of Puerto Rico consented to the application of section 9, but such generic consent to the application of all laws, present or future, is hardly liberating in nature.

Trías Monge, *Plenary Power, supra* note 21, at 23–24.

**44.** The following is a brief chronology of the efforts to revise the terms of the United States–Puerto Rico relationship:

**1959** Fernós–Murray Bill H.R. 5926, 86th Cong. (1959); S.2022, 86th Cong. (1959), to

Although the final determination of the status of Puerto Rico is a political question for the Congress and the people of Puerto Rico to decide, the applicability of the federal death penalty in the Commonwealth, under the present constitutional arrangement, is not. The wholesale application of federal laws to the Commonwealth under the aegis of section 9 of the PRFRA, coupled with the gradual erosion during the last forty eight years of the principle of government by consent, has come to the point where, in the case of unilaterally applying the death penalty, it clashes with the **principle of liberty** enshrined in the Declaration of Independence and the Constitution of the United States, thereby **violating the substantive due process rights of the American citizens of Puerto Rico.** It also does violence to the principle of the consent of the governed underlying the Federal Constitution and the relationship between the people of Puerto Rico and the United States.

There are few intrusions "so serious ... on personal liberty" as "[c]riminal trial and punishment." *Duro v. Reina*, 495 U.S. 676, 693, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). Undoubtedly, "[t]he power ... to try and criminally punish is an important

manifestation of the power to restrict personal liberty." *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 210, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).[45] The ultimate manifestation of the intrusion on personal liberty through the exercise of the power to criminally try and punish is, of course, the imposition of the **death penalty,** which irrevocably ends the most basic of rights, **life.** Tellingly, the FDPA itself recognizes the vitality of the principle of the consent of the governed to the imposition of capital punishment in establishing special provisions for Indian country:

> No person subject to the criminal jurisdiction of an Indian tribal government shall be subject to a capital · sentence under this chapter for any offense the Federal jurisdiction for which is predicated solely on Indian country ... and which has occurred within the boundaries of Indian country, **unless the governing body of the tribe has elected that this chapter have effect over land and persons subject to its criminal jurisdiction.**

18 U.S.C. § 3598 (emphasis added).[46]

That federal legislation aimed at furthering the common good may be applied

revise the compact and replace the PRFRA with the Articles of Permanent Association

**1963** Aspinall Bill, H.R. 5945, 88th Cong. (1963), to establish a Commission to draft a proposed compact of permanent union between the people of the United States and the people of Puerto Rico

**1964** Pub.L. No. 88–271, 78 Stat. 17, to establish a United States–Puerto Rico Commission of the Status of Puerto Rico

**1966** Report of the United States–Puerto Rico Commission of the Status of Puerto Rico transmitted to the President and Congress on August 5, 1966

**1967** Status Plebiscite in which improved Commonwealth Status received 60% of the vote (no action taken by the Congress to implement the choice)

**1971** Report of the Ad Hoc Advisory Group on the Presidential Vote for Puerto Rico transmitted to the President and Congress on August 18, 1971

**1975** H.R. 11200–1, 94th Cong. (1975) to approve the Compact of Permanent Union between Puerto Rico and the United States

(drafted by the Advisory Group named by the President and the Governor of Puerto Rico) on October 1, 1975

**1989** S. 712, 101st Cong. (1989) to provide for a Referendum on the Political Status of Puerto Rico

**1993** Status Plebiscite, in which improved Commonwealth Status obtained a majority of 46.5% of the votes (no action taken by Congress to implement the choice)

**1996** Young Bill H.R. 856, 105th Cong. (1996) (which would have become the United States–Puerto Rico Political Status Act)

**45.** Of course, the Court is not ruling that the *per se* application in the Commonwealth of all federal criminal statutes violates the due process rights of the citizens of Puerto Rico.

**46.** The relevance of the principle of government by consent to the exercise of the power to criminally try and punish was expressly recognized by the Supreme Court in *Duro v. Reina,* 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990). In that case, the Court

to the Commonwealth on the basis of the generic consent given by the people Puerto Rico in section 9 of the PRFRA concededly does not raise major constitutional concerns.[47] But applying to the Commonwealth a statute allowing for the **deprivation of life,** on the basis of the generic consent given in section 9 forty eight years ago, is unreasonable and unfair; inadmissibly infringes upon the principle of government by consent on which the people of Puerto Rico's relationship with the United States is grounded; **and constitutes a violation of the fundamental rights to liberty and life of the American citizens of Puerto Rico.**[48] In this connection, the words of John Locke come to mind:

> Th[e] freedom from absolute, arbitrary power, is so necessary to, and closely joined with a man's preservation, that he cannot part with it, but by what forfeits his preservation and life together. For a man, not having the power of his own life, cannot, by compact, or his own consent, enslave himself to any one, nor put himself under the absolute, arbitrary power of another, to take away his life when he pleases.

John Locke, *The Second Treatise of Government (An Essay Concerning the True, Original, Extent and End of Civil Government)* 14 (J.W. Gough ed., 1956) (1689). "The exercise of plenary powers over a people, even with their consent, is incompatible with the idea of liberty." José Trías Monge, *Plenary Power and the Principle of Liberty: An Alternative View of the Political Condition of Puerto Rico,* 68 Rev.Jur.U.P.R. 1, 25 (1999).

It **shocks the conscience to impose the ultimate penalty, death,** upon American citizens who are denied the right to participate directly or indirectly in the government that enacts and authorizes the

---

considered whether an Indian tribe may assert criminal jurisdiction over a United States citizen who, although an Indian, is not a tribal member. The Court held that "the retained sovereignty of the tribe as a political and social organization to govern its own affairs does not include the authority to impose criminal sanctions against citizens outside its own membership." *Id.* at 679, 110 S.Ct. 2053. While Court grounded its holding in large measure on the history and special nature of tribal courts, it nevertheless stated its hesitancy "to adopt a view of tribal sovereignty that would single out a[ ] group of citizens, nonmember Indians, for trial by political bodies that do not include them." *Id.* at 693, 110 S.Ct. 2053. The Court thus "reject[ed] an extension of tribal authority over those who have not given the consent of the governed that provides a fundamental basis for power within our constitutional system." *Id.* at 694, 110 S.Ct. 2053. The so-called jurisdictional void arguably created by the Court's decision, *see id.* at 697, 110 S.Ct. 2053, was subsequently addressed by Congress, who enacted legislation recognizing that tribal criminal jurisdiction could be extended to all Indians on the reservation. *See Cabazon Band of Mission Indians v. Smith,* 34 F.Supp.2d 1195, 1199 n. 10 (C.D.Cal.1998).

**47.** *See, e.g., United States v. Rivera Torres,* 826 F.2d 151 (1st Cir.1987) (Clean Water Act); *Caribtow v. Occupational Safety and Health Review Com'n,* 493 F.2d 1064 (1st Cir.1974) (Occupational Safety and Health Act).

**48.** As stated almost a century ago by Justice Brown in *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901):

> There are certain principles of natural justice inherent in the Anglo–Saxon character, which need no expression in constitutions or statutes to give them effect or to secure dependencies against legislation manifestly hostile to their real interests....

> We suggest, without intending to decide, that there may be a distinction between certain natural rights enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinions and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom of speech and of the press; to free access to courts of justice, to due process of law, and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishments; and to such other immunities as are indispensable to a free government.

*Id.* at 280, 282–82, 21 S.Ct. 770.

imposition of such punishment.[49] It is **unconscionable** and against the most basic notion of justice to permit that the American citizens of Puerto Rico be subjected to capital punishment for crimes committed wholly within the boundaries of the Commonwealth, while at the same time denying them a say in the political process of the government that tries them. If the qualitative difference of the death penalty has been sufficient to require more reliable procedures for its imposition, it certainly ought to be sufficient to require that its availability as punishment be grounded, in its origin, **on the consent of those whose rights may be affected by its imposition,** such consent expressed through their participation in the political process as a manifestation of their free will. As recognized by the Supreme Court in *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977): "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based **on reason** rather than caprice or emotion." *Id.* at 358, 97 S.Ct. 1197 (emphasis added). A decision to apply the death penalty in Puerto Rico without the consent of its people is not, and does not appear to be, based on reason.

## IV

The Court, having concluded that the Federal Death Penalty Act of 1994, as amended, 18 U.S.C. § 3591 *et seq.* is "locally inapplicable" within the meaning of section 9 of the Puerto Rican Federal Relations Act, 48 U.S.C. § 734, and because applying the federal death penalty in Puerto Rico unilaterally, without the consent of its people, violates defendants' substantive due process of law, hereby **GRANTS** defendants' "Motion to Declare the Federal Death Penalty Inapplicable in the Commonwealth of Puerto Rico" (**Docket # 247**). Accordingly, the death penalty certification is hereby **STRICKEN**. This shall continue as an ordinary felony case.

**SO ORDERED.**

---

49. Perhaps it is easy to forget, now more than two centuries removed from the events, that one of the indictments of the Declaration of Independence against King George III was that he had "combined with others to subject us to a Jurisdiction foreign to our Constitution, and unacknowledged by our Laws," in enacting legislation "[f]or imposing Taxes on us without our Consent." The Declaration of Independence para. 16 (U.S.1776). It would be interesting to know what would have been the tenor of an indictment by the Founders charging the King of England with imposing capital punishment upon them without their consent.